[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON DEFENDANTS' MOTION IN LIMINE RE PLAINTIFFS' SUPPLEMENTAL DISCLOSURES OF EXPERT WITNESSES
By substitute complaint for wrongful death dated June 28, 1991, the plaintiffs, Pamela S. Stevens, administratrix of the Estate of Christy S. Stevens, and Judith Gallo, administratrix of the Estate of Michael R. Gallo, brought a four count complaint against Biagio DiLieto, former mayor of the City of New Haven, employees of the City of New Haven and the City of New Haven. The first and third counts are defective highway counts against the City of New Haven, pursuant to General Statutes 13a-149, brought by the Estate of Stevens and the Estate of Gallo, respectively. These counts allege that the defective condition at the Mill River drawbridge on Chapel Street, New Haven, on the late evening of November 12, 1988, or the early morning of November 13, 1988, caused the death of the decedents. The second and fourth counts are negligence counts against the individual defendants, brought by the Estate of Stevens and the Estate of Gallo, respectively.
The defendants have filed a substituted answer and special defenses to the substitute complaint, including special defenses alleging contributory negligence by each of the decedents.
On September 30, 1992, pursuant to Practice Book 220D, the plaintiffs filed a disclosure of expert witnesses in which the plaintiffs disclosed that they intended to have numerous experts testify at the trial of this matter, including Peter D. DeForest, D. Crim., and Michael M. Baden, M.D. CT Page 6112
As to Dr. DeForest, the disclosure stated, in part:
 (b) Dr. DeForest will testify, if necessary, in rebuttal to any testimony offered by the defendants relating in any way to the forensic sciences.
 (c) Dr. DeForest will testify that the physical evidence found in and on the vehicle and at the scene is not sufficient to determine the location of the occupants within the vehicle at the time of this accident.
 (d) Dr. DeForest will base his testimony upon his education, training and experience in the field of the forensic sciences and his examination of the vehicle, and any testing he undertook.
As to Dr. Baden, the disclosure stated, in part:
 (b) Dr. Baden will testify regarding the manner in which the plaintiffs' decedents lost their lives.
 (c) Dr. Baden will testify as to the length of time that it would have taken the plaintiffs' decedents to expire from asphyxia by drowning and the pain and suffering, both physical and mental, each experienced before death.
 (d) Dr. Baden's testimony will be based upon his experience, education and training in the field of pathology and his review of the autopsy reports and other associated documentary evidence.
On June 1, 1993, the plaintiffs filed a supplemental disclosure of expert witnesses as to each of Dr. DeForest and Dr. Baden.
As to Dr. DeForest, the supplemental disclosure stated, in part: CT Page 6113
 Subject Matter Dr. DeForest will of Testimony: testify as to the forensic evidence in this case and the implications of said evidence.
 Substance of Dr. DeForest will the Facts and testify that Opinions to the probable driver Which Expert of the motor vehicle is Expected at the time of the to Testify: accident was Jill Sawyer.
 Summary and Dr. DeForest will base Grounds for his testimony upon his Each Opinion: education, training and experience in the field of the forensic sciences and his examination of the forensic evidence related to this case, including, but not limited to, evidence secured from the scene, the vehicle, and the occupants of the vehicle, as well as the autopsies performed on the occupants of the vehicle and the tests conducted by Dr. Henry Lee.
As to Dr. Baden, the supplemental disclosure stated, in part:
 Subject Matter Dr. Baden will testify of Testimony: regarding the manner in which the plaintiffs' decedents lost their lives as well as to the forensic and pathological evidence in this case and the CT Page 6114 implications of said evidence.
 Substance of Dr. Baden will testify the Facts as to the length of time and Opinions that it would have taken to Which the plaintiffs' decedents Expert is to expire from asphyxia by Expected to drowning and the pain and Testify: suffering, both physical and mental, each experienced before death. Additionally, Dr. Baden will testify that the probable driver of the motor vehicle at the time of the accident was Jill Sawyer.
 Summary and Dr. Baden's testimony Grounds for will be based upon his Each Opinion: experience, education and training in the field of pathology and his review of the autopsy reports and other documentary evidence.
The defendants have filed a motion in limine re plaintiffs' supplemental disclosure of expert witnesses in which they seek to preclude the plaintiffs from offering expert testimony at the time of trial as to the probable driver of the motor vehicle at the time of the accident. The defendants claim that the opinions set forth in the supplemental disclosures are completely new and different expert opinions on a critical issue in the case that are diametrically opposed to the opinions the plaintiffs originally disclosed as to these same experts and that, unless the motion in limine is granted, the defendants will be unduly prejudiced and the trial will be significantly delayed.
 I.
Based upon the extensive exhibits presented to the CT Page 6115 court, the arguments made by counsel during the hearings on this motion in limine on June 14 and June 18, 1993, and the prior orders entered in this matter, the court makes the following findings of fact.
The automobile accident upon which this matter is founded occurred on November 12 or November 13, 1988, when a motor vehicle (the "motor vehicle") occupied by the two decedents in this case and two decedents in two companion cases drove off an open bridge being repaired in the Chapel Street bridge area in New Haven. The motor vehicle plunged into the Mill River and the four occupants drowned in the motor vehicle.
On November 21, 1988, the New Haven Police Department submitted to the State Police Forensic Science Laboratory (the "laboratory") certain items of physical evidence from the accident for examination by the laboratory. The submission included items described as follows:
 ITEM # NAME AND EXAMINATION DESCRIPTION REQUESTED OF ITEM TO BE EXAMINED
 1. section of examine int. fractured side for hair windshield glass and if found compare to known victims
 2. several hair compare to strand specimens known victims. collected from int. driver's side roof area above visor.
Also submitted were known pulled hair samples of each of the four victims. The "remarks" accompanying the submission stated, in part: "Finding from items 1 and 2 may help I determine driver of vehicle at time of accident."
Dr. Ferdinand D. Ruszala, supervising criminalist, and Dr. Henry C. Lee, chief criminalist, signed an eight-page CT Page 6116 forensic science laboratory report, dated December 15, 1988, with reference to the physical evidence submitted to the laboratory by the New Haven Police Department.
The report listed numerous items submitted, including the following:
 1. Plastic bag "with section of fractured windshield glass"
2. Envelope with "hair strand specimens"
. . . .
 10. Envelope with hair samples 10A. "known head hair, Michael Gallo"
 10B. "Known head hair, Laura LaGrotteria"
10C. "Known head hair, Jill Sawyer"
 10D. "Known head hair, Christy Stevens"
The "results of examination" section of the report stated, in part:
 1. Item #1 was found to contain a portion of windshield, approximately twenty-nine inches by twenty-nine inches (29" x 29") in size (see Photos #1 and #2).
 An emission sticker, #1520838, expiration date 30 DEC 1988," was located on the lower left of the windshield, as shown in Photos #3 and #4. Numerous fracture patterns were observed on submitted item #1, as shown in Photos #5 and #6. . . . . . . .
 2. A small reddish-colored stain was found on the inside of the middle right CT Page 6117 portion of submitted item #1. This reddish stain is shown in attached Photos #11 and #12.
 This stain gave positive results with a chemical presumptive test for blood. The quantity of sample was insufficient for further analysis.
. . . .
 5. Hair-like materials and small fragments of paper-like material were also found on submitted item #1.
 Microscopical examination of those hair-like materials revealed the following:
 A. One (1) human caucasian-type head hair, approximately six inches (6") long, light brown color.
 B. One (1) human caucasian-type head hair fragment, approximately one-half inch (1/2") long, light brown color.
C. One (1) animal hair.
 6. The human caucasian-type head hair found on item #1 demonstrated microscopical characteristics similar to the known head hair in submitted item 10C.
 Three (3) hair-like materials were found in submitted item #2, as shown in Photos #17 and #18. Macroscopical and microscopical examination revealed these hairs are human caucasian-type head hairs. These hairs showed microscopical characteristics similar to the known head hairs in submitted item #10C. CT Page 6118
At the end of the "results of examination" section the following comment was made:
 It is to be noted that microscopical hair comparisons do not serve as a positive means of identification.
Attorney Robert I. Reardon, Jr., attorney for the plaintiffs in this matter, first discussed the case with Dr. DeForest on December 8, 1988. Dr. DeForest was retained by Attorney Reardon to examine the vehicle to see if a reconstruction of the accident would be possible, including "the question of who was where in the car."
Dr. Lee wrote to Attorney Reardon on December 9, 1989, and advised him that "the laboratory has finished its preliminary testing on several items submitted to us by the New Haven Police Department [and that] (a)ll the evidence since then has been returned to the New Haven Police Department."
Attorney Reardon wrote to Attorney Arnold Bai, attorney for the defendants in this matter, on January 9, 1989, and requested the pulled head hairs of his clients' decedents and "(a)ll tangible objects removed from the Stevens' vehicle including, but not limited to: . . . the pieces of windshield removed from the car;. . . the `several hair specimens collected from the right driver's side roof area above the visor; . . .
On February 2, 1989, the plaintiffs filed a motion to compel in which they sought the same items referred to in Attorney Reardon's letter of January 9. On February 6, 1989, the court, (Leuba, J.), denied the defendants' motion to quash the plaintiffs' motion to compel, including as to item "Z. Forensics-Submissions to Forensic Laboratory by New Haven Police Dept. 11/21/88."
On March 6, 1989, counsel for the parties agreed during argument before the court that "with respect to hair samples that were taken from the bodies and found inside of the car, they will be turned over to" the plaintiffs and the court, (Hendel, J.), ordered that "(a)ll personal property will be returned to plaintiffs. . ." CT Page 6119
On July 9, 1989, Dr. DeForest reviewed the laboratory report and copies of photos of the motor vehicle which he had received from Attorney Reardon the previous day. At that time, Dr. DeForest made notes to himself about additional materials he would like to see, including autopsy reports, lab notes and known hair samples.
Dr. DeForest made additional notes on October 9, 1989, referring to the laboratory report, as follows:
 "Blood stain inside middle right of windshield. Hair on windshield. Jill Sawyer 10C hair on submitted item number 2. Where was number 2 collected?"
Dr. DeForest advised Attorney Reardon on May 10, 1992, that Dr. Lee had told him that he would not take any definitive position as to who was driving the motor vehicle.
In September, 1992, a law clerk in Attorney Reardon's office spoke to Dr. Baden and advised him that there was a very specific question they had relative to how long it took for the decedents' deaths to occur Dr. Baden requested the autopsy reports, toxicology reports, pertinent police reports and pertinent photographs. Dr. Baden subsequently received from Attorney Reardon's office the autopsy reports, some portions of the police report and some photographs.
Dr. Baden stated in his deposition of May 10, 1993, that he did not see any trauma indicated in the autopsy reports other than a bruise on Jill Sawyer's nose. When questioned as to his understanding of where the respective occupants of the motor vehicle were seated at the time of the accident, he responded:
 In addition to what we discussed, it just came to mind that I had made a note about the black-and-blue mark on the nose of Jill Sawyer which I indicated to Mr. Reardon could, is a suggestion of an impact against the steering wheel or. . . windshield.
On January 19, 1993, the court, (Hendel, J.), CT Page 6120 ordered that jury selection in this case would commence on July 20, 1993, and the trial of the case would start on September 8, 1993. Subsequently, the commencement date for the trial was extended to September 14, 1993, due to the scheduling of the annual Judges Institute on September 8th, 9th and 10th.
Dr. DeForest's notes of February 27, 1993, indicate the following:
 CSP [Connecticut State Police] lab report received today. . . . Windshield portion with fragments and fractures, reddish blood like stain, hair on windshield. Two Caucasians plus one animal, similar to known 10C, then three hairs in envelope with item number 2 similar to known 10C? Where were these from in car?
Dr. DeForest stated in his deposition taken on March 26, 1993, that he was aware of the presence of hair above the driver's visor and hair in the fractured windshield, but that he did not know where the hairs were actually recovered from in the vehicle.
In a deposition taken on March 3, 1993, Dr. Lee testified that he did not believe that he personally or the laboratory had in their possession any of the forensic evidence in this case.
On March 27, 1993, Attorney Reardon wrote to Attorney Jeffrey Blueweiss, who had assumed the defense of this case upon the death of Attorney Bai, and requested "hair samples of the victims and any hair strand specimens obtained for nondestructive testing."
The plaintiffs filed a motion to compel production on April 12, 1993, in which they sought the production of many items of evidence, including:
 5. Any and all hair samples and/or hair strand specimens of the decedents' now in the possession of the defendants or their representatives; CT Page 6121
On April 14, 1993, Attorney Reardon wrote to Attorney Blueweiss memorializing a telephone conversation of April 14, 1993, in which Attorney Blueweiss agreed that the City of New Haven would voluntarily comply with the plaintiff's motion, including such item 5.
On April 14, 1993, a representative of the plaintiffs' counsel received from the New Haven Police Department "known pulled hair samples" of the four decedents and "several hair strand specimens collected from interior driver's roof area" of the motor vehicle. The hair specimens were immediately delivered to Dr. DeForest. Dr. DeForest examined the hair specimens and determined that there were still hair specimens which had been examined by Dr. Lee which had not been delivered to him. Dr. DeForest telephoned Dr. Lee to inquire as to the whereabouts of such hair specimens and, as a result, Dr. Lee conducted a search of the laboratory and was able to locate ten slides with the hair specimens found in the windshield of the motor vehicle.
On May 26, 1993; the plaintiffs filed a motion to compel production of "(t)he hair samples recovered from the windshield. . ." On May 27, 1993, Attorney Blueweiss' secretary wrote to Attorney Reardon and requested that the hair samples be picked up at the New Haven Police Department.
On May 28, 1993, a representative of Dr. DeForest picked up the samples at the New Haven Police Department. Dr. DeForest immediately examined the hair samples and determined that a hair specimen removed from the windshield exhibiting microscopically similar characteristics to that of the head hair of Jill Sawyer displayed characteristics consistent with being deposited on the windshield as a result of a head impacting the windshield. Based on such examination and other evidence available to him, Dr. DeForest concluded that Jill Sawyer was the probable driver of the motor vehicle.
On May 28, 1993, Dr. DeForest advised Dr. Baden of his conclusion and, based on such additional forensic evidence, Dr. Baden also concluded that Jill Sawyer was the probable driver of the motor vehicle.
II. CT Page 6122
In support of their motion in limine, the defendants claim that the plaintiffs are now seeking to introduce on the eve of trial, eight months after they were required by Practice Book Section 220 and the express order of the court, (Hendel, J.), to disclose their experts' opinions, completely new and different opinions on a critical issue in this case that are diametrically opposed to the opinions they originally disclosed as to these same experts. The defendants claim that the motion in limine must be granted or otherwise the defendants will be unduly prejudiced and the trial of these cases will be significantly delayed.
The defendants' claim is based primarily on their position that the disclosure of expert witnesses by the defendants did not indicate with reference to Dr. DeForest and Dr. Bader that either expert would offer testimony as to the location of the occupants within the motor vehicle. Based on the disclosure of expert witnesses and other previous statements made by the plaintiffs in answers to interrogatories, answers to requests for admissions and in their complaint on the issue of who was driving the motor vehicle at the time of the accident, the defendants argue that they formulated certain defensive strategies and then retained experts, conducted discovery and gathered evidence in accordance with said strategies. If the plaintiffs' experts are allowed to offer their new opinions that Jill Sawyer was the driver of the motor vehicle, the defendants claim they will be compelled to engage in further pretrial activity, including retaining additional experts, conducting further discovery and supplementing their disclosure of expert witnesses, all of which would make it impossible for this case to proceed to trial as scheduled.
Practice Book section 220D provides:
 (D) In addition to and notwithstanding the provisions of subsections (A), (B) and (C) of this section, any plaintiff expecting to call an expert witness at trial shall disclose the name of that expert, the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the CT Page 6123 expert is expected to testify, and a summary of the grounds for each opinion, to all other parties within 60 days from the date the case is claimed to a trial list. Each defendant shall disclose the names of his or her experts in like manner within 120 days from the date the case is claimed to a trial list. If disclosure of the name of any expert expected to testify at trial is not made in accordance with this subsection, or if an expert witness who is expected to testify is retained or specially employed after that date, such expert shall not testify except in the discretion of the court for good cause shown.
Counsel for both the plaintiffs and the defendants agreed during the second argument on this motion in limine that the case which is most appropriate to a determination of whether Dr. DeForest and Dr. Baden should be allowed by the court in the exercise of its discretion for good cause shown under Section 220D to testify as to their new opinions with reference to the driver of the motor vehicle is Sturdivant v. Yale-New Haven, 2 Conn. App. 103 (1984).
In Sturdivant, a medical malpractice case, the plaintiff informed the defendants on March 5, 1982, in response to the defendants' interrogatories, that she had neither retained an expert to testify nor consulted any experts not intended to be called as a witness. On May 27, 1982, after jury selection had commenced, the plaintiff's counsel disclosed the identity of her expert doctor. The court then ordered that the defendants' interrogatories with reference to experts be answered by the plaintiff and that thereafter the plaintiff allow the defendants an opportunity to depose her expert.
Prior to the taking of the expert's deposition, supplemental answers to interrogatories were filed in which the plaintiff stated that the subject matter with respect to which the expert was expected to testify was the "standard of care and departures from the standards of care." Defense CT Page 6124 counsel limited the scope of his inquiry at deposition to the disclosed subject matter of the testimony expected at trial. The plaintiff's counsel asked no questions at the time of the deposition nor indicated that the witness' testimony would embrace factors other than "standards of care."
During the trial, the plaintiff attempted to establish that the defendant physician's treatment was improper by posing a hypothetical question to the plaintiff's expert. The trial court sustained the defendants' objection on the basis that the expert would not be able to testify on the issue of causation because causation was not within the scope of the disclosed subject matter of the expert's proposed testimony. On appeal, the plaintiff claimed that the trial court abused its discretion when it excluded her expert's testimony on causation.
In analyzing the relationship between the plaintiff and the expert, the Appellate Court stated at page 106:
 The plaintiff's relationship with physician Marvin Garrell deserves a more detailed analysis. During his deposition on June 4, 1982, Garrell stated that he had been asked to render an informal opinion in the case a few years previously but that he had not been retained to testify at trial at that juncture. In her brief, the plaintiff claims that Garrell was not consulted in anticipation of litigation or preparation for trial, but only on a informal basis. The plaintiff claims that Garrell was formally retained on May 28, 1982, the day after jury selection began. The court's conclusion that Garrell had been consulted earlier and that the file had been submitted to him for review is dispositive of this argument. The plaintiff's claim that Garrell wasn't formally retained as an expert until after the trial started is a tactical subterfuge, which, if left CT Page 6125 unchallenged by the court, would seriously undermine the salutary effect of the rules of discovery and production concerning expert testimony in malpractice cases. Such a "cat and mouse" game was properly not condoned by the trial court. (Emphasis by court).
The Appellate Court upheld the trial court's decision and stated at page 108:
 The court's conclusion, that the consequences of the plaintiff's failure fully and fairly to disclose, despite being given ample opportunity to do so, should fall upon the plaintiff rather than upon the defendants, was not an abuse of discretion. To hold otherwise would unfairly deny, under the circumstances of this case, the defendants the opportunity to prepare for or challenge the proposed testimony concerning causation.
Counsel for the defendants argues that, similar to defense counsel, in the Sturdivant case, he limited the scope of his inquiry at deposition to the disclosed subject matter of the testimony expected at trial and that, as in the Sturdivant case, counsel for the plaintiffs did not ask any questions or indicate that Dr. DeForest's testimony would differ in any way from those opinions previously disclosed.
The defendants' reliance upon Sturdivant is misplaced. In Sturdivant, the trial court allowed, over the objection of the defendants, testimony of the plaintiff's expert, even though the expert was not disclosed until during jury selection, the expert had been consulted by the plaintiff a few years previously and the plaintiff had failed to reveal the expert's name in response to a specific interrogatory as to whether the plaintiff had retained an expert to testify or had consulted any expert not intended to be called as a witness. CT Page 6126
In the present case, on September 30, 1992, the plaintiffs revealed the names of Dr. DeForest and Dr. Baden in their disclosure of expert witnesses in accordance with Section 220 and the court's order. At the time of the filing of the disclosure of expert witnesses, the description given of the testimony expected from Dr. DeForest and Dr. Baden was based upon forensic evidence which had previously been turned over to the plaintiffs by the defense. Notwithstanding repeated requests made to the defense by the plaintiffs and two orders entered by the court, all the forensic evidence tested by Dr. Lee was not made available to Dr. DeForest until May 28, 1993, seven months after the plaintiffs filed their original disclosure of expert witnesses. The failure of the defense to make such evidence available was due to the inadvertence of Dr. Lee in misplacing the ten slides of human hair specimens received from the windshield of the motor vehicle.
On the very day when the hair specimens were delivered to Dr. DeForest, he examined the specimens and reached his conclusion that Jill Sawyer was the driver of the motor vehicle. He immediately advised Dr. Baden of his conclusion and Dr. Baden reached a similar conclusion.
On June 1, 1993, the first day court was open after May 28, the plaintiffs filed their supplemental disclosure of experts in which they indicated the new opinions of the experts as to the driver of the motor vehicle. On June 1, seven weeks remained before the scheduled date for jury selection in this case and three and one-half months remained before the scheduled date for the commencement of trial.
The new opinion offered by the expert in the Sturdivant case was offered during the expert's testimony in the trial, not three and one-half months before trial. Moreover, in the Sturdivant case the party opposing the new opinion offered by the expert did not, through its actions, do anything to interfere with the rendering of such opinion at the time of the earlier disclosure.
Counsel for the defendants further indicated during the second argument on this motion in limine that he relied upon Pool v. Bell, 209 Conn. 536 (1989). In Pool, another malpractice case, on August 9, 1985, the defendant, in response to an interrogatory filed by the plaintiff CT Page 6127 requesting that the defendant identify each person the defendant expected to call as an expert witness at trial, stated "undetermined at this time." On January 29, 1986 and May 27, 1986, the defendant supplemented his responses to the plaintiff's interrogatories, but did not name his expected witnesses. On February 25, 1987, the defendant complied with an order by the court to disclose his experts by January 3, 1987, and named a general surgeon as his expert.
On July 7, 1987, three weeks before the scheduled trial date, the defendant disclosed that he intended to use an additional medical expert. The plaintiff filed a motion in limine to preclude the additional expert from testifying. After an argument on the motion in which counsel confirmed that the defendant had been consulting with the additional expert for over one year, the trial court granted the plaintiff's motion in limine.
In upholding the decision of the trial court, the Supreme Court said at page 541:
 We conclude that the trial court could reasonably have viewed the late date at which the defendant disclosed [the additional expert] as the sort of "cat and mouse" game that the rules of discovery and production were designed to discourage. See Sturdivant v. Yale-New Haven Hospital, supra; 106.
In this case, the plaintiffs, who have offered additional opinions of their previously disclosed experts three and one-half months before trial based on evidence which was not delivered to them in accordance with numerous requests by the plaintiffs and two court orders over a four-year period, cannot be compared with the defendant in the Pool case, who failed to reveal until three weeks before trial an expert with whom he had been consulting for over one year, who was in violation of a court order and who supplied misleading information in responses to interrogatories.
Other cases cited by the defendants in their memorandum of law in support of motion in limine in which expert testimony was held to have been properly excluded by CT Page 6128 the trial court are also distinguishable from the present case. Mulroney v. Wambolt, 215 Conn. 211 (1990) (expert revaled [revealed] during jury selection by offeror who had given misleading responses to interrogatories); Yale University School of Medicine v. McCarthy, 26 Conn. App. 497 (1992) (offeror failed to comply with court's order to inform the other party of expert witnesses offeror planned to call to trial); Perry v. Hospital of St. Raphael, 17 Conn. App. 121
(1988) (offeror provided substance of facts and opinions to which one expert was expected to testify and disclosed an additional expert for the first time less than two weeks before jury selection); Kemp v. Ellington Purchasing Corporation, 9 Conn. App. 410 (1986) (offeror offered evidence during trial on an issue that other parties were led to believe during the deposition of the expert the expert would not be testifying as to and the offeror did not alert the other parties to the offeror's intention to do so); Perez v. Mount Sinai Hospital, 7 Conn. App. 514 (1986) (offeror revealed expert just prior to commencement of jury selection after failing to disclose experts and after court previously had granted other parties' motion to exclude expert testimony).
The present case is not one in which the plaintiffs, who are offering additional opinions of previously disclosed expert witnesses, can be said to be playing a "cat and mouse" game that the rules of discovery and production were designed to discourage and the court finds that the additional opinions should be allowed unless to do so would unduly prejudice the defendants.
The defendants' claim that they will not have sufficient time before the date scheduled for trial of this case to secure additional experts and discovery and to revise their defense strategies to meet the new opinions offered by Dr. DeForest and Dr. Baden with reference to the driver of the motor vehicle are not well-founded.
The opinion of Dr. DeForest is based on forensic evidence which has already been examined by the defendants' forensic expert, Dr. Lee, who has considered the question of the driver of the vehicle and has determined that he would not take any definitive position as to who was driving the motor vehicle. CT Page 6129
The opinion of Dr. Baden is based on both forensic evidence examined by Dr. Lee and pathological forensic evidence, the physical injuries to the decedents. The defendants' experts include two forensic pathologists who performed the actual autopsies of the four decedents, upon which autopsies Dr. Baden relied for the pathological forensic findings he made.
Other experts have already been retained by the defendants who have testified in depositions as to the location of the occupants within the motor vehicle. Michael Berkowitz, who evaluated the reaction time of the driver of the motor vehicle, testified that the identity of the driver "doesn't really matter as to the opinions that I will give in this case." Edmond Sullivan, whom the defendants disclosed as having an opinion on "the significance of the location of the occupants within the subject vehicle. . .," testified that it was his opinion that Michael Gallo was the likely driver of the motor vehicle.
The pathological evidence indicates that Jill Sawyer had a blood alcohol content of .06, the lowest blood alcohol level of the four victims. Dr. Charles Berry, an expert in the field of toxicology, whom the defendants disclosed would testify that "all of the victims were under the influence of alcohol at the time of the accident and that such a condition greatly increased their chances of becoming involved in a serious or fatal accident," testified that all of the decedents were "impaired as far as driving vehicles are concerned" due to the alcohol levels present in their bodies. Dr. Brian E. Pape, another expert in the field of toxicology retained by the defense, testified that "the risk of serious and fatal motor vehicle accidents is doubled at about .04 or .05."
It is, therefore, apparent that the defendants have already made efforts to identify the driver of the motor vehicle and have designed a defense based upon a claim that the cause of the accident can be attributed to any of the decedents, inasmuch as the alcohol level found in each of the decedents would be sufficient under the testimony offered b, y the defendant's experts during their depositions to have been the proximate cause of the accident.
The court, therefore, finds that to allow the CT Page 6130 additional testimony of Dr. DeForest and Dr. Baden will not unduly prejudice the defendants.
 III.
For the reasons stated above, the court denies the defendants' motion in limine re plaintiffs' supplemental disclosures of expert witnesses and makes the following orders:
(1) On or before July 2, 1993, the plaintiffs will make Dr. Peter D. DeForest and Dr. Michael M. Baden available to the defendants for further deposition limited solely to the issue of their opinions that Jill Sawyer was the operator of the motor vehicle.
(2) On or before July 2, 1993, the defendants will file a supplemental disclosure of expert witnesses pursuant to Section 220 of the Practice Book, limited solely to additional expert testimony with reference to the location of the occupants of the motor vehicle.
(3) On or before July 16, 1993, the defendants will make any experts previously retained by them or disclosed in accordance with paragraph 2 of this order available to the plaintiffs for further deposition limited solely to the issue of the location of the occupants of the motor vehicle.
(4) The date for the filing of paragraphs 4 and 5 only of the joint trial conference report ordered by the court, (Hendel, J.), on May 5, 1993, is extended to August 9, 1993.
Hendel, J.